UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK  

EDWARD A. SCERBO, on behalf of himself
and all others similarly situated,

         Plaintiff,

    -against-

SIRIUS XM RADIO INC.,

        Defendant.

Civil No. _____

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED



**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Tel.: 201-567-7377
Fax: 201-567-7337

**FARUQI & FARQUI, LLP**
Nadeem Faruqi
Shane T. Rowley
369 Lexington Avenue
10th Floor
New York, New York 10017
Tel: 212-983-9330
Fax: 212-983-9331

# TABLE OF CONTENTS

**Page**

I.  NATURE OF ACTION ................................................................. 1

II.  JURISDICTION AND VENUE ................................................. 4

III.  PARTIES ................................................................................ 4

IV.  BACKGROUND ON SATELLITE RADIO INDUSTRY ................ 5
    A.    Before The Merger, The Two Companies Were Competitors ................ 6
    B.    Sirius And XM Agree To Merge And Seek Regulatory Approval ........ 7
        1.    Department Of Justice Makes Erroneous Predictions And
            Determinations About The Effect Of The Proposed Merger And
            Closes Its Investigation ................................................ 7
        2.    Due To Purported Hundreds Of Millions Of Dollars In Savings, Sirius
            And XM Promise That Efficiencies From The Merger Will Benefit
            Consumers ....................................................... 9
        3.    FCC Approves License Transfer But Only With Conditions Limiting
            Price Increases ................................................ 11

V.  SIRIUS XM ABUSES ITS MONOPOLY POWER BY RAISING PRICES ......... 13
    A.    Sirius XM Increases Various Subscriber Fees By March 2009 ............ 14
        1.    Sirius XM Increases Prices To Multi-Receiver Subscribers By 29% ....... 14
        2.    Sirius XM Increases Prices For Internet Access For Existing
            Subscribers ...................................................... 15
    B.    Sirius Raises Prices Under The Guise Of A Royalty Pass-Through ..... 15
        1.    The Company Committed To Imposing Only A Limited
            Pass-Through Of Royalty Increases .......................... 16
         2.    Sirius XM's Royalty Fees Are Not Charged At A Consistent Rate, And
            Therefore Cannot Be Simply A Pass-Through Of Costs ............ 18
        3.    The Royalty Fees Charged To Subscribers Far Exceed The Actual
            Increase In Royalties That Sirius XM Is Entitled To Pass Through ....... 20
            a.    Sirius XM Incurred A 0.5% Increase In Sound Recording
                Royalty Rates ........................................... 20
            b.    Sirius XM Incurred Minor Increases In Musical Works Royalty
                Fees .................................................. 21
            c.    The Royalty Fee Is Greater Than A Pass-Through Of Royalty
                Cost Increases Since March 20, 2007 ................... 22
         4.    Sirius XM Makes False And Deceptive Statements  To Its Subscribers
            And The Public About The Music Royalty Fee ..................... 25

VI.  SIRIUS XM HAS FAILED TO INCREASE CONSUMER CHOICE BY
     ADDING A LA CARTE PROGRAMMING, AS PROMISED ................ 29

VII.    SIRIUS XM HAS A MONOPOLY IN THE U.S. SDARS MARKET, WHICH IT HAS USED TO THE DETRIMENT OF CONSUMERS ........................................................ 30

      A.    The Relevant Product Market Is Satellite Digital Audio Radio Service In The United States ................................................................................................................. 31

      B.    Sirius XM Has Profitably Sustained The Increased Prices To SDARS Consumers ..................................................................................................................... 34

VIII.    NAMED PLAINTIFF SUFFERED DAMAGES DUE TO THE ANTICOMPETITIVE CONDUCT AND FALSE, DECEPTIVE, AND  ILLEGAL ACTS OF SIRIUS XM..... 35

IX.    CLASS ALLEGATIONS ............................................................................................... 36

COUNT I ........................................................................................................................... 39

COUNT II .......................................................................................................................... 40

COUNT III ......................................................................................................................... 41

COUNT IV ......................................................................................................................... 42

PRAYER FOR RELIEF .................................................................................................... 48

Plaintiff Edward A. Scerbo, individually and on behalf of all others similarly situated, upon personal knowledge as to his own acts and status, and upon information and belief as to all other matters, makes the following allegations against Sirius XM Radio Inc. ("Sirius XM" or the "Company"), individually, and as the successor-in-interest to Sirius Satellite Radio Inc. ("Sirius") and XM Satellite Holdings Inc. ("XM"):

## I.    NATURE OF ACTION

1.    This is an action brought pursuant to federal antitrust laws, state consumer protection statutes, and state common law against Defendant Sirius XM to remedy its abuse of monopoly power, deceptive practices, and breach of contracts, which have injured consumers. On July 28, 2008, XM and Sirius – the only two providers of satellite digital audio radio service ("SDARS") in the United States – merged to form Sirius XM. The merger provided Sirius XM with monopoly power over SDARS in the United States. Since the merger, Sirius XM has abused its monopoly power by increasing prices above competitive levels, breaching subscriber contracts, and making false and misleading statements to subscribers and the public.

2.    Prior to the merger, Sirius and XM were competitors and the presence of the two companies kept prices stable. In over six years of operation prior to the merger, Sirius never raised its monthly charge, and XM raised its monthly charge only once. Despite this price stability, both companies were growing, with subscribers and revenue increasing, even as the recession was decimating businesses in late 2007 and into 2008.

3.    Federal law required that Sirius and XM get approval from the Federal Communications Commission (the "FCC") to transfer to the combined Company the FCC licenses that permitted satellite radio broadcasts. As part of the FCC approval process, Sirius and XM made commitments to the FCC that, if permitted to transfer the licenses and merge the two companies, the combined Company would institute price freezes, offer new programming,

and provide other services to enhance consumer welfare. In addition, Sirius and XM executives pledged that consumers would benefit from *lower* prices once the efficiencies of the merger were realized.

4.     Although the FCC acknowledged that the merger would give monopoly power to the combined Company, the FCC approved the license transfers conditioned on the combined Company complying with the pricing and other pro-consumer commitments. The combined Company, Sirius XM, however, has breached those commitments and abused the monopoly power that it gained from the merger.

5.     Sirius and XM were also required under federal law to obtain clearance to merge from the Department of Justice (the "DOJ"). The DOJ closed its investigation into the merger based on its determination that: (1) the combined Company, Sirius XM, would not be able to "profitably sustain an increased price to satellite radio consumers"; and (2) efficiencies from the merger would "be passed on to consumers in the form of lower prices." The conduct by Sirius XM since the merger has shown that the DOJ was wrong on both points. Since gaining monopoly power, Sirius XM has profitably sustained multiple price increases to satellite radio consumers, and the supposed efficiencies of the mergers have not been passed on to consumers in the form of lower prices.

6.     Within just six months of the merger and the elimination of competition in the SDARS market, the combined Company announced an increase in monthly charge per additional radio for multi-radio subscribers by nearly 30% (from $6.99 per month for each additional radio to $8.99 per radio). This 30% price increase became effective on March 11, 2009, less than eight months after the merger.

2

7.     Before the merger, Sirius and XM provided its subscribers with free internet access to their programming through a lower-speed connection.  But on March 11, 2009, the Company eliminated that option and began to require all subscribers seeking internet access to pay a monthly charge of $2.99.

8.     Effective July 29, 2009 – one year after the merger was finalized – Sirius XM again increased prices by charging an excessive "U.S. Music Royalty Fee" (the "Royalty Fee") of 10% to 28%, which it deceptively represented to customers as a direct pass-through of only increases in the royalty fees since March 20, 2007, that it pays to the music industry, *i.e.*, musicians, record companies, and music publishers.

9.     In sum, between the new fees and rate increases, a subscriber with one additional radio who had accessed the internet service for free previously was paying $19.94 per month and is now paying $27.88 – a 40% increase in total.

10.     Within a year of the merger, Sirius XM subscribers have seen that the Company's commitment to offering competitive prices was illusory.  Equally illusory was the Company's commitment to abiding by the conditions Sirius and XM had proposed.  Thus, these commitments have provided no effective limitation on the Company's ability to abuse its monopoly power.

11.     The Company's illegal and deceptive conduct has harmed competition and injured consumers in the SDARS market in the United States.  Thus, Plaintiff brings claims for violation of the federal antitrust laws and state consumer protection statutes, as well as a state law claim for breach of contract.

3

## II.    JURISDICTION AND VENUE

12.    This is a class action involving more than 100 class members, a member of the Plaintiff's Class is a citizen of a state different from Defendant, and the amount in controversy, in the aggregate, exceeds the sum of $5,000,000, exclusive of interest and costs.

13.    This Complaint is filed, and these proceedings are instituted, under common law, consumer protection statutes, the Clayton Act, 15 U.S.C. § 12, *et seq.*, and the Sherman Act, 15 U.S.C. § 1, *et seq.* to recover threefold damages and the costs of suit and reasonable attorneys' fees, for the injuries sustained by Plaintiff and members of the Class of direct purchasers of SDARS resulting from Sirius XM's illegal conduct.

14.    The jurisdiction of this Court is based upon 28 U.S. C. §§ 1331, 1332(d), 1337(a), and 15 U.S.C. § 15.

15.    Sirius XM transacts business in and has its principal place of business in this District.  Venue therefore is proper in this District pursuant to 15 U.S.C. § 22, and 28 U.S.C. § 1391.

## III.    PARTIES

16.    Plaintiff Edward A. Scerbo is a resident of New Jersey and subscriber of Sirius SDARS in New Jersey.

17.    Greater than two-thirds of all Class members are residents of states other than the State of New York.

18.    Defendant Sirius XM is a Delaware Corporation with its principal place of business at 1221 Avenue of the Americas, 36th Floor, New York, New York.  It is the successor entity resulting from the merger of Sirius and XM.

19.    Sirius is a former Delaware corporation that merged on July 28, 2008 with XM to form Sirius XM.

20.    XM is a former Delaware corporation that merged on July 28, 2008 with Sirius to form Sirius XM.

21.    Sirius XM, Sirius, and XM have been engaged at all relevant times in "commerce" as defined in Section 1 of the Clayton Act, 15 U.S.C. § 12. Sirius XM's, Sirius's, and XM's general business practices, the merger of Sirius and XM, and the unfair methods of competition alleged herein are acts "in or affecting commerce."

22.    Sirius XM, Sirius, and XM authorized and/or participated in the conduct complained of herein, and are directly liable for the damages incurred by Plaintiff and the proposed Class.

## IV.    BACKGROUND ON SATELLITE RADIO INDUSTRY

23.    Sirius XM broadcasts music, sports, news, talk, entertainment, traffic and weather channels for a subscription through two satellite radio systems – the Sirius system and the XM system.

24.    Sirius XM is the combination of two entities, Sirius and XM, which merged to form Sirius XM on July 28, 2008.[1] Before the merger created Sirius XM, Sirius and XM were the only providers of SDARS in the United States.

25.    Sirius XM's primary source of revenue is subscription fees, with most of its customers subscribing on an annual, semi-annual, quarterly, or monthly basis.

26.    As of September 30, 2009, Sirius XM had 18,515,730 subscribers.

---

[1] The merger took place on July 28, 2008 and the actual name change to Sirius XM Radio Inc. occurred on August 5, 2008.

## A.     BEFORE THE MERGER, THE TWO COMPANIES WERE COMPETITORS

27.     Before the merger, XM and Sirius each provided SDARS.  Each company spent billions of dollars to enter the SDARS market.

28.     In April 1997, XM was one of the winning bidders in the FCC's auction of 25 MHz of spectrum in the S-band allocated to satellite radio, for which XM paid nearly $90 million to the U.S. Treasury.  The FCC awarded XM the license to provide satellite radio services in the 2332.5-2345 MHz band.  XM's wholly owned subsidiary XM Radio Inc. held the licenses as well as satellite, earth station, and experimental licenses issued by the FCC.

29.     XM began providing SDARS in September 2001.  As of December 31, 2006, it provided SDARS to approximately 7.6 million subscribers.

30.     Before merging with Sirius, XM invested over five billion dollars, primarily to: (1) develop and upgrade its network; (2) design chipsets and radios capable of receiving its service; (3) subsidize the cost of such chipsets and radios to encourage their distribution; (4) develop subscriber-based management systems and other information technology; (5) market its brand; and (6) create compelling programming for subscribers.

31.     In April 1997, Sirius paid more than $83 million to the U.S. Treasury at auction for rights to provide satellite radio in the 2320-2332.5 MHz band, and the FCC authorized a Sirius subsidiary to construct, launch, and operate three geostationary satellites.  In addition to the satellite radio authorization, Sirius holds related earth station and wireless licenses.

32.     Sirius began providing SDARS in February 2002.  As of December 31, 2006, Sirius had approximately 6 million SDARS subscribers in the United States.

33.     Before merging with XM, Sirius invested over five billion dollars, primarily to: (1) develop and upgrade its network; (2) design chipsets and radios capable of receiving its service; (3) subsidize the cost of such chipsets and radios to encourage their distribution; (4)

6

develop subscriber-based management systems and other information technology; (5) market its brand; and (6) create compelling programming for subscribers.

34.     Between February 2002 and July 2008, when both XM and Sirius were operating and providing SDARS to their subscribers, the competition between them kept prices stable. In over six years of operation prior to the merger, Sirius never raised its monthly charge, and XM raised its monthly charge only once. *See* Sirius XM's Joint Opposition to Petitions to Deny and Reply Comments at 13-14 n. 31 (FCC filing July 24, 2007).

**B.     SIRIUS AND XM AGREE TO MERGE AND SEEK REGULATORY APPROVAL**

**1.     Department Of Justice Makes Erroneous Predictions And Determinations About The Effect Of The Proposed Merger And Closes Its Investigation**

35.     On February 19, 2007, Sirius and XM entered a Merger Agreement providing for the conversion of XM stock into a right to receive stock of Sirius. The proposed merger could not close until both the DOJ and the FCC had signed off on the deal.

36.     On March 13, 2007, Sirius and XM filed its pre-merger notification with the DOJ, which gave federal antitrust regulators 30 days to review the merger before its consummation. On April 12, 2007, Sirius and XM received a request for additional information from the DOJ, which extended the waiting period during which the deal could not close. The companies completed their additional submissions in early September 2007.

37.     According to public reports that surfaced late in 2007, the career attorneys and economists at DOJ suggested that the DOJ move to block the merger. On March 24, 2008, however, the DOJ announced its decision to close its investigation into the proposed transaction. The DOJ concluded that the relevant market – for antitrust analysis purposes – was not limited to SDARS. The DOJ explained its conclusion as follows:

The Division found that evidence developed in the investigation did not support defining a market limited to the two satellite radio firms, and similarly *did not establish that the combined firm could profitably sustain an increased price* to satellite radio consumers.

\* \* \*

The evidence did not demonstrate that the number of current or potential customers that view XM and Sirius as the closest alternatives is large enough to make a price increase profitable. Importantly in this regard, the parties do not appear to have the ability to identify and price discriminate against those actual or potential customers that view XM and Sirius as the closest substitutes.

Statement of the DOJ Antitrust Division on its Decision to Close its Investigation of XM Satellite Radio Holdings Inc.'s Merger with Sirius Satellite Radio Inc. (Mar. 24, 2008) (hereafter the "DOJ Statement") (emphasis added).

38.    The DOJ Statement, which closed the investigation into the merger, anticipated that likely efficiencies created by the merger would be passed on to consumers with lower prices.

Likely Efficiencies

To the extent there were some concern [sic] that the combined firm might be able profitably to increase prices in the mass-market retail channel, efficiencies flowing from the transaction likely would undermine any such concern. The Division's investigation confirmed that the parties are likely to realize significant variable and fixed cost savings through the merger. . . . [T]he Division estimated the likely variable cost savings – those savings most likely to be passed on to consumers in the form of lower prices – to be substantial. For example, the merger is likely to allow the parties to consolidate development, production and distribution efforts on a single line of radios and thereby eliminate duplicative costs and realize economies of scale. These efficiencies alone likely would be sufficient to undermine an inference of competitive harm.

DOJ Statement.

39.    The DOJ closed its investigation based on two assumptions: (1) that the combined company, Sirius XM, would not be able to "profitably sustain an increased price to satellite radio consumers;" and (2) that efficiencies from the merger would "be passed on to consumers in the

form of lower prices." *Id.* Since the merger, the conduct of Sirius XM has proven that the DOJ's

determinations were wrong.

>    **2.    Due To Purported Hundreds Of Millions Of Dollars In Savings, Sirius And XM Promise That Efficiencies From The Merger Will Benefit Consumers**

40.    Because the proposed merger involved the transfer of control of FCC licenses,

Section 310(d) of the Communications Act of 1934 mandated that an application be made to the

FCC for authority to transfer control.    47 U.S.C. § 310(d).    The FCC was prohibited, under

Section 310(d), from approving the transfer of control – and hence the merger – unless the

Agency found that the transfer would serve the public interest, convenience, and necessity.

47 U.S.C. § 310.

41.    Sirius and XM filed a joint application to the FCC for approval of the transfer and

merger on March 20, 2007.    *See* Consolidated Application for Authority to Transfer Control

(FCC filing Mar. 20, 2007) (the "Application").

42.    In connection with its license transfer Application, Sirius and XM provided the

sworn statement of David Frear, presently the Executive Vice President and Chief Financial

Officer of Sirius XM:

>    Prior to the announcement of this merger and immediately thereafter, securities analysts estimated that there would be efficiencies from the merger of Sirius and XM Satellite Radio ("XM") on the order of hundreds of millions of dollars annually. . . Sirius' management independently considered the potential for synergies and cost savings from a merger with XM and also believe that there would be hundreds of millions of dollars in annual efficiencies.

>    * * *

>    [I]t is my professional opinion and belief that a merger of Sirius and XM will result in significant, *cognizable synergies in every line item of the income statement that will benefit consumers* and that are not achievable without this merger.

Decl. of Frear ¶ 35, Ex. D to Sirius XM's Joint Opposition to Petitions to Deny and Reply Comments at 13 (FCC filing July 24, 2007) (emphasis added).    At the time of Frear's declaration, he was Executive Vice President and Chief Financial Officer of Sirius. *Id.*

43.    The Application predicted that "[t]he synergies resulting from the merger will allow the combined company to provide consumers *lower prices* and more programming choices." Application at 9 (emphasis added).

44.    Sirius XM pledged that "no satellite radio subscriber will have to pay more . . . as a result of the merger." FCC Memorandum and Order (hereafter "FCC Order" or the "Order") at 11-12 (July 25, 2008); *see also* Sirius XM's Joint Opposition to Petitions to Deny and Reply Comments at 13 (FCC filing July 24, 2007).

45.    Sirius and XM committed to the FCC that if the merger/transfer of licenses was approved, the combined company would not raise prices:

> The combined company will not raise the retail price for its basic $12.95 per month subscription package, the a la carte programming packages . . . and the new programming packages . . . for thirty six months after consummation of the merger.

FCC Order at 88 (Appendix B, Applicants Voluntary Commitments submissions, June 13, 2008 letter); *see also* July 25, 2008 letter at 2.

46.    Sirius XM also promised that "[s]ubscribers will also be able to continue their $6.99 multi-receiver subscriptions."   Sirius XM's Joint Opposition to Petitions to Deny and Reply Comments at 14 (FCC filing July 24, 2007).

47.    Sirius XM committed to the above pricing restrictions in order to persuade the FCC and the public that the Sirius XM merger would not create a monopoly, lessen competition, result in increased prices, or otherwise harm the consumer.

48.     In addition, Sirius XM committed to *increasing* subscriber choice. For example, Sirius and XM jointly committed that the merged company would provide an "a la carte" service that would allow subscribers to choose 50 channels (*i.e.*, a subset of the full menu) for a lower monthly fee than subscribers pay for the standard package. Thus, the combined entity was supposed to improve the range of available options at no additional cost to subscribers.

49.     As detailed below, the Company has exploited every opportunity to evade the price restrictions to which it agreed in order to prevent its abuse of monopoly power and has only marginally expanded the variety of choices available to subscribers. It has abused its monopoly power and will continue to do so absent intervention of this Court.

### 3.     FCC Approves License Transfer But Only With Conditions Limiting Price Increases

50.     Numerous parties, including consumer groups, submitted comments to the FCC arguing against approval of the Application. Many commentators noted that the voluntary conditions that Sirius and XM were proposing would be inadequate to protect consumers. As noted by FCC Commissioner Jonathan S. Adelstein, who voted against approval, "consumers [would] get a monopoly with window dressing," given the "gaping loopholes" in the voluntary commitments. FCC Order at 98-99.

51.     Over the objections of two dissenting Commissioners, as well as numerous consumer groups, the FCC approved the Application for the license transfer in the Order adopted on July 25, 2008, effectively clearing the way for the merger. Yet at the time, the FCC acknowledged the potential for abuse of the Company's newly-granted monopoly power:

> Based on the record before us, we conclude that the proposed transfer of control would violate our rule against one licensee controlling both SDARS licenses. We also conclude that, absent Applicants' voluntary commitments and other conditions discussed below, the proposed transaction would increase the likelihood of harms to competition and diversity. As discussed below, assuming a

satellite radio product market, *Applicants would have the incentive and ability to raise prices* for an extended period of time.

* * *

Applicants, however, have proposed significant voluntary commitments regarding steps the merged company would take to mitigate harms and achieve public interest benefits. *We find that absent those voluntary commitments and other conditions, the harms of the transaction would outweigh the potential public interest benefits.*

FCC Order at 5 (emphasis added).

52.    Indeed, in light of the potential anticompetitive effect, the FCC conditioned the approval of the license transfer on Sirius and XM's commitments to cap prices and limit cost increases, making the merger "one of the most heavily-conditioned in FCC history." FCC Order at 109.

53.    The FCC Order provides:

For the reasons given above, we assume that the relevant product market may be limited to SDARS, and therefore that it is likely that the merged entity will have an increased incentive and ability to raise prices above pre-merger levels and that this incentive and ability will grow stronger over time.

As discussed above, Applicants have argued, however, that due to the particular nature of demand for satellite radio services, the merged entity will have an incentive instead to lower prices. *Several commenters dispute this argument, and instead predict that the merged entity will raise prices.* For example, NAB states that SDARS is the relevant market, that the merger will lead to a monopoly, and that demand is relatively inelastic, so that the merged entity will be able to raise prices profitably. C3SR agrees with a narrow product definition, and raises concerns regarding higher prices, foregone benefits from price competition, increased advertising, and lower value overall. Similar concerns are raised by Common Cause, KEI, and AAI.

To address concerns about such potential price increases, Applicants have voluntarily committed to cap the retail prices on their basic subscription package and on the new programming packages that they voluntarily commit to offer. Specifically, Applicants voluntarily commit to not raise the retail prices on their basic $12.95 per month subscription package, their a la carte programming package, their "best of both" programming packages, their "mostly music" and their "news, sports, and talk" programming packages, and their discounted family-friendly programming package. Applicants voluntarily commit to these

12

price caps for at least 36 months after consummation of the merger. Notwithstanding the voluntary commitment, after the first anniversary of the consummation of the merger, the combined company may pass through cost increases incurred since the filing of the merger application as a result of statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees. The combined company will provide customers, either on individual bills or on the combined company's website, details about the specific costs passed through to consumers pursuant to the preceding sentence.

*We accept this voluntary commitment and conclude that it will mitigate the harm from any post-merger price increases.* In addition, Applicants may not reduce the number of channels in either their current packages or their new packages for three years. Some commenters submit that the price cap should be longer than three years, arguing that the potential harms will still remain at the end of the period. We do not know what the competitive landscape will be like in three years. Accordingly, six months prior to the expiration of the commitment period, the Commission will seek public comment on whether the cap continues to be necessary in the public interest. The Commission will then determine whether it should be modified, removed, or extended. *We also note that Applicants voluntarily commit to a price cap, not a price freeze, and therefore retain sufficient flexibility to flow through to consumers any cost savings or other efficiencies resulting from the merger.*

FCC Order at 47-48 (emphasis added).

54.     The FCC Order thus implemented a self-imposed price cap for 36 months after the July 28, 2008 merger consummation, until July 28, 2011. Sirius XM did not, however, wait long before finding numerous ways to evade these constraints.

## V.    SIRIUS XM ABUSES ITS MONOPOLY POWER BY RAISING PRICES

55.     The merger of XM and Sirius gave Sirius XM monopoly power in the SDARS market in the United States. Sirius XM has abused this power and harmed consumers by substantially and profitably increasing prices three times within one year of the merger (including a price increase announced within six months of the merger). In spite of the FCC's attempts to forestall the inevitable impact of combining the only two companies in the market, the merged entity has already exhibited anticompetitive behavior that has harmed consumers. Plaintiff seeks to remedy this harm and prevent future abuses.

A.    SIRIUS XM INCREASES VARIOUS SUBSCRIBER FEES BY MARCH 2009

56.    By mid-March 2009, less than a year after the merger was completed, Sirius XM implemented its first price increases.    Since the Company was bound by its commitments incorporated in the FCC Order not to increase its monthly base rate above the $12.95 cap, it needed other ways to increase its revenue.    It therefore turned to the various fees that were not governed by the FCC Order and raised those instead.    As explained below, Sirius XM's newly-acquired monopoly power has enabled the Company to increase prices above competitive levels, thereby harming the Company's subscribers.

1.    Sirius XM Increases Prices To Multi-Receiver Subscribers By 29%

57.    Before the merger, Sirius and XM offered multi-receiver subscription discounts that permitted subscribers to pay a reduced fee of $6.99 per month for each additional radio (for up to five total radios), rather than paying the full $12.95.

58.    In its efforts to persuade the FCC to approve the Application, Sirius XM promised not to increase the multi-receiver subscription prices above this level.    Sirius XM's Joint Opposition to Petitions to Deny and Reply Comments at 13 (FCC filing July 24, 2007).    This promise was not, however, incorporated into the final conditions the FCC imposed.    Thus, Sirius XM readily abandoned it.

59.    On January 25, 2009, just six months after the merger was approved, Sirius XM announced that it would increase the monthly price charged to multi-receiver subscribers. Effective March 11, 2009, Sirius XM increased the price by $2.00 per radio: from $6.99 to $8.99 per radio, a 29% increase.

60.    Upon information and belief, approximately 20% of Sirius XM subscribers are multi-receiver subscribers.    Of its approximately 18.5 million subscribers, roughly 3.8 million have therefore been subject to this 29% increase for each additional receiver used.    Sirius XM is

14

now earning approximately an additional $7.4 million per month (assuming the multi-receiver subscribers have one additional receiver and pay on a monthly basis), or nearly $89 million annually. Indeed, in Sirius XM's most recent quarterly earnings report, the Company attributes its increased revenues in part to the increase in multi-receiver fees.

### 2.    Sirius XM Increases Prices For Internet Access For Existing Subscribers

61.    Also, effective March 11, 2009, Sirius XM began charging $2.99 for all subscribers accessing Sirius or XM programming via the internet. Prior to this time, this fee was only applicable for users accessing the programming via the high-quality 132 bkps connection. Sirius and XM users accessing the programming through the lower-quality 32 bkps or 64 bkps connections could do so for free.

62.    The Company's plan to increase prices was never disclosed to the FCC during proceedings relating to the approval of the merger. The Company has provided no cost-based justification for the increases. Rather, as conveyed to a subscriber, "[f]or business reasons, XM began charging for the right to listen to our service on the Internet." Email from Joe Sarella, Chief    Service    Officer,    Sirius    XM,    to    Scott    Greczkowski, http://www.multichannel.com/blog/The_Satellite_Dish/11674-Some_Sirius_ly_Good_News.php.    In other words, the Company decided it could be more profitable by removing the free offering and replacing it with a service costing users another $2.99 per month, thereby increasing price and reducing choice. Sirius XM also attributed its increased revenue to this new fee – additional evidence that the Company possesses market power and has readily abused it.

### B.    SIRIUS RAISES PRICES UNDER THE GUISE OF A ROYALTY PASS-THROUGH

63.    On July 29, 2009 (one year after the merger), Sirius XM used its monopoly power to raise prices by approximately 10%-28% by imposing a "U.S. Music Royalty Fee," which

Sirius XM's customer contract (the "Customer Agreement") states is a "pass-through" of only the increase in music royalty fees that occurred during the period March 20, 2007 (when Sirius and XM filed their request to the FCC to approve the transfer of broadcast licenses to the combined Company) and July 29, 2009 (one year after the consummation of the merger). However, the Royalty Fees appearing on subscribers' bills bear little relationship to the increase in royalty rates that occurred during the period between March 20, 2007 and July 29, 2009. Moreover, subscribers with different subscription plans are paying different rates, which would not be the case if the Royalty Fee was simply a pass-through. In reality, Sirius XM has used the Royalty Fee as a clever artifice to impose unilateral price increases on its subscribers, thereby boosting its revenue, as evidenced by the fact that Sirius XM includes the Royalty Fees in "Other revenue" on its consolidated statements of operations. *See* Sirius XM Radio Inc., (Form 10-Q), at 37 (Nov. 5, 2009) ("Q2 2009 Form 10-Q").

### 1.    The Company Committed To Imposing Only A Limited Pass-Through Of Royalty Increases

64.    Pursuant to the FCC Order, Sirius XM's voluntary price cap leaves the door open for one type of price increase – a limited pass-through of the *increase* in royalty rates Sirius and XM paid to various parties in the music industry between the time the companies applied for FCC approval of the license transfer and the time the license transfer necessary for the merger was approved. In particular, the Order states:

> Notwithstanding the foregoing [agreement not to raise prices], after the first anniversary of the consummation of the merger, the combined company *may pass through cost increases* incurred since the filing of the combined company's FCC merger application as a result of statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees. The combined company will provide customers, either on individual bills or on the combined company's website, specific costs passed through to consumers pursuant to the preceding sentence.

16

FCC Order at 88-89 (emphasis added). Purportedly in compliance with these conditions, beginning on July 29, 2009, Sirius imposed the Royalty Fee on all plans initiating or renewing after that date.

65.    The FCC Order refers to music royalties when using the terms (quoted in the preceding paragraph) "payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees." Sirius XM pays two types of music royalties relating to the performance of music on its satellite broadcasts: (1) royalties for the performance of the sound recording ("sound recording royalties"); and (2) royalties for the performance of the musical works, including the lyrics and musical composition ("musical works royalties"). Sirius XM does not pay music royalties for programming that has only incidental (or no) music, such as the shows on talk radio, news, and sports channels, including the talk radio programming that is provided to subscribers of the Sirius XM "Plus" packages.

66.    Section 102 of the Copyright Act of 1976 (the "Copyright Act") identifies various categories of works that are eligible for copyright protection. 17 U.S.C. § 102. These include "musical works" and "sound recordings." *Id.* at §§ 102(a)(2) & 102(a)(7). The term "musical work" refers to the notes and lyrics of a song, while a "sound recording" results from "the fixation of a series of musical, spoken, or other sounds." *Id.* at § 101. Thus, a recorded song will constitute a "sound recording" by the entity that records the performance, and a "musical work" by the songwriter. Typically, a record label owns the copyright in a sound recording and a music publisher owns the copyright in a musical work.

### 2.   Sirius XM's Royalty Fees Are Not Charged At A Consistent Rate, And Therefore Cannot Be Simply A Pass-Through Of Costs

67.     Sound recording and musical works royalties are paid as a percentage of music-related gross revenue, which generally includes subscription fees and advertising revenue derived from music channels.[2] Thus, for any Sirius or XM subscription plans offering primarily music programming, the royalty rates Sirius and XM pay to the music industry – and hence charge their subscribers via the FCC-sanctioned pass-through – should be a consistent percentage.

68.     However, as shown in the chart below, the current Royalty Fees differ depending on the subscribers' choice of plan. While subscribers to the Sirius or XM basic plan pay a rate of approximately 15% per month, some subscribers pay a rate as low as roughly 10%, while others pay more than 28%.

---

[2] Sirius and XM also pay royalties relating to the sale of portable recording devices. These royalties are not part of the Royalty Fee.

**Table 1**
**Royalty Fee and Rates According To Subscription Plan**

| Subscription Plan | Subscription Price ($) | Royalty Fee ($) | Royalty Fee as % of Plan Price |
|---|---|---|---|
| XM Everything (Basic) | 12.95 | 1.98 | 15.29% |
| XM Everything Family Friendly | 11.95 | 1.83 | 15.31% |
| XM Everything Plus* | 16.99 | 1.98 | 11.65% |
| XM Everything Plus Family Friendly* | 14.99 | 1.83 | 12.21% |
| XM Mostly Music | 9.99 | 1.53 | 15.32% |
| XM Multi-Receiver (per add'l radio) | 8.99 | 0.97 | 10.79% |
| Sirius Everything (Basic) | 12.95 | 1.98 | 15.29% |
| Sirius Everything Family Friendly | 11.95 | 1.83 | 15.31% |
| Sirius Everything Plus* | 16.99 | 1.98 | 11.65% |
| Sirius Everything Plus Family Friendly* | 14.99 | 1.83 | 12.21% |
| Sirius Mostly Music | 9.99 | 1.53 | 15.32% |
| Sirius Multi-Receiver (per add'l radio) | 8.99 | 0.97 | 10.79% |
| Sirius A la Carte Gold | 14.99 | 1.98 | 12.21% |
| Sirius A la Carte | 6.99 | 1.98 | 28.33% |

* The Royalty Fees on the "Plus" plans are less than 15.3% of the subscription price *only* because those plans include basic subscription packages with music programming "plus" talk radio shows, which are not subject to the Royalty Fee. Thus, the subscription prices are higher but the dollar amount of the Royalty Fee is not, resulting in a Royalty Fee that is a lower percentage of the total subscription price.[3]

69.    Sirius XM does not provide an explanation why it charges a Royalty Fee of 28.3% of the subscription price of the Sirius A La Carte Plan, while charging a Royalty Fee of only 12.21% for the A La Carte Gold plan.  Nor does the Company explain why it charges a Royalty Fee of 15.29% for the Sirius Everything Plan, while charging a Royalty Fee of 10.79%

---

[3] For example, subscribers of the XM Everything Plus and Sirius Everything Plus plans pay $12.95 for the same music programming that is available on the XM Everything and Sirius Everything plans, as well as $4.04 for the non-music talk radio programming, for a total of $16.99.  Because the non-music talk radio programming is not subject to a music royalty fee, Sirius XM cannot apply the Royalty Fee to the $4.04.  Instead, the Royalty Fee is $1.98, the same Royalty Fee that the Company charges for the $12.95 Everything plans.  So, although the percentage of the "Plus" plans' *total* subscription price attributable to the Royalty Fee is only 11.65%, the Royalty Fee as a percentage of the subscription price attributable to music programming (*i.e.*, $12.95) remains 15.3%, *i.e.*, the same percentage as the Everything plans.  Accordingly, even for the "Plus" plans, the Royalty Fees greatly exceed the amounts that Sirius XM is permitted to charge pursuant to its Customer Agreements and the FCC Order.

per additional radio under the Multi-Receiver Plan.[4]  Moreover, as shown below, the Royalty

Fees far exceed the increase in royalty rates that Sirius XM is now paying for sound recording

and musical work royalties.  Thus, the Company is using the new Royalty Fee as a subterfuge to

unilaterally raise subscription prices and, with no other SDARS service providers in the market

to challenge this practice, subscribers have no choice but to pay the supracompetitive prices.

### 3. The Royalty Fees Charged To Subscribers Far Exceed The Actual Increase In Royalties That Sirius XM Is Entitled To Pass Through

#### a. Sirius XM Incurred A 0.5% Increase In Sound Recording Royalty Rates

70.    Prior to the merger, Sirius and XM both paid the same or substantially the same

sound recording royalties and musical works royalties, which were calculated and paid as a

percentage of music related gross revenue.

71.    Effective January 1, 2007, the royalty rate paid by Sirius and XM for the

performance of sound recordings was 6% of music related gross revenues.  This rate was

established by the Copyright Royalty Board on January 24, 2008.  *See* Determination of Rates

and Terms for Preexisting Subscription Services and SDARS, 73 Fed. Reg. 4080, 4084 (Jan. 24,

2008) ("CRB Determination").

72.    Before the Copyright Royalty Board established the rate for 2007, for accounting

purposes, XM and Sirius established a 2007 royalty rate for the performance of sound recordings

of 4.0% to 4.2%.  *See Id.* at 4098.

73.    Effective January 1, 2009, the royalty rate paid by Sirius XM for the performance

of sound recordings increased to 6.5% of music related gross revenues. *Id.*

---

[4] As discussed above, *see* Section V.A.1, *supra*, the multi-receiver subscription plans had already suffered an increase in price of 29% before the implementation of the Royalty Fee.  The total price increase to multi-
*(Cont'd)*

74.    The increase in royalty rates for sound recordings paid by Sirius and XM between March 20, 2007 and July 29, 2009 was thus only 0.5%.

75.    The 0.5% increase in royalty rates for sound recordings during the period March 20, 2007 and July 29, 2009 is the only royalty rate increase mandated by a decision of the Copyright Royalty Board.

### b.    Sirius XM Incurred Minor Increases In Musical Works Royalty Fees

76.    The royalty rates Sirius and XM have paid for the performance of musical works are not set by the Copyright Royalty Board but instead are determined pursuant to private negotiations between the users (*i.e.*, Sirius and XM) and the copyright holders (*i.e.*, the music publishers or songwriters), which are not made public.

77.    On information and belief, in 2007, Sirius and XM paid a musical works royalty fee of approximately 4% of music related gross revenue.

78.    On information and belief, by July 29, 2009, the royalty rate paid by Sirius and XM for the performance of musical works increased to not more than 6.5% of music related gross revenues.

79.    The Copyright Royalty Board determined that royalty rates for musical works are generally substantially less than royalty rates for sound recordings. *Id.* at 4089-90. Thus, on information and belief, if the royalty rate was 6.5% for the performance of sound recordings in 2009, the royalty rate for musical works paid by Sirius XM was not more than that amount. *Id.*

---

subscription plans since the merger is 42%.

80.    On information and belief, the increase in royalty rates for the performance of musical works paid by Sirius and XM between March 20, 2007 and July 29, 2009 was thus no more than 2.5%.

### c.    The Royalty Fee Is Greater Than A Pass-Through Of Royalty Cost Increases Since March 20, 2007

81.    Table 2 below summarizes the royalty rates Sirius and XM paid in 2007 and 2009, as detailed above, and the increases from 2007 to 2009.

### Table 2
### Royalty Rates Paid To Industry

| Year | Sound Royalty Rate | Musical Works Royalty Rate[5] | Total Royalty Rate |
|------|--------------------|-------------------------------|--------------------|
| 2007 | 6% | 4% | 10% |
| 2009 | 6.5% | 6.5% | 13% |
| | | | |
| Increase | 0.5% | 2.5% | 3% |

82.    The combined increase in royalty fees for musical works and sound recordings for the period March 20, 2007 through July 29, 2009 was no more than 3% (0.5% increase for sound recording royalties, and no more than a 2.5% increase for musical works).  Thus, according to its Customer Agreements and commitments to the FCC, Sirius XM is only entitled to charge its subscribers a Royalty Fee equal to 3% of music-related gross revenue.[6]

---

[5] The Musical Works Royalty Rates in Table 2 are set forth on information and belief based on actual information relating to the musical works rates in 2006, actual sound recording royalty rates for 2006-2009, Sirius and XM's accounting practices for the 2007 year before the CRB determination, and the fact that musical works royalty rates generally are less than sound recording royalty rates.

[6] The 2007 sound recording royalty rates were implemented retroactively.  To the extent Sirius XM claims it is entitled to look at the rates that it accounted for before the CRB Determination, the relevant rates were 4%-4.2%. Together with the 4% musical works rate, the total would have been 8%-8.2%.  The increase from these rates to the 2009 total royalty rate of no more than 13% is 4.8%-5%, which is still far less than the increase in royalty rates claimed by Sirius XM when imposing the Royalty Fee.

83.    Sirius XM currently charges Royalty Fees of 10% - 28% of subscription revenue – well above the rates the Company would be charging if it were simply passing through the approximately 3% increase in royalties since March 20, 2007, as set forth in the FCC Order and required by the Customer Agreements.  Indeed, even if Sirius XM were entitled to charge a Royalty Fee equal to *all* the Company's royalties paid to the music industry (as opposed to charging only the increases in such fees paid since March 20, 2007), the Royalty Fee would still be excessive.

84.    Further, the Company pays royalties only on its gross revenue *attributable to music programming*, which differs from the Company's gross revenue.  Gross revenue for purposes of calculating music royalty fees does not include sales and use taxes, shipping and handling, credit card, invoice, and fulfillment service fees.  *See* 37 CFR § 382.11 (identifying those payments and fees that are excluded when calculated gross revenue for purposes of determining royalty fees).  Gross revenue for purposes of calculating music royalty fees also does not include subscription revenue used to pay royalties.[7]  Therefore, to the extent that the subscription prices include amounts to cover expenses for music royalties; sales and use taxes; shipping and handling; and credit card, invoice, and fulfillment fees, Sirius XM would pay no royalties on such amounts and accordingly is not entitled to charge a Royalty Fee on such amounts.  Thus, if the Company uses $1.00 of the $12.95 basic subscription price to pay for music royalties; sales and use taxes; shipping and handling; and credit card, invoice, and fulfillment fees, the $1.98 Royalty Fee charged to subscribers choosing this plan actually

---

[7] Because both Sirius and XM had previously been absorbing the cost of royalty payments, those pre-existing royalty fees – like the various other fees, taxes, and charges – are properly excluded from the gross music-related revenue that is used to calculate the royalty payments due to the music industry, and, accordingly, the Royalty Fees the Company *should* be charging its subscribers.

constitutes 16.6% ($1.98/$11.95) of the music-related revenue – even more than the 15.29% calculated in Table 1 above. As this example shows, the values shown in Table 1 therefore are likely to *understate* the actual percentage of music-related revenue the Company is charging its subscribers. Accordingly, these values also *understate* the magnitude of the overcharge that subscribers are paying with the current Royalty Fees.

85.    In addition to music programming subscription revenue, gross revenue for the purposes of calculating royalty fees includes advertising revenue generated for music programming. Thus, for example, Sirius XM's gross revenue for purposes of calculating royalty rates includes a small portion of the approximately $47 million in advertising revenue Sirius XM reported in 2008. Most of this advertising revenue is generated from non-music programming (such as the talk radio channels), and therefore should not be included in the gross revenue calculations for determining the royalties owed. However, even adding all that revenue to the gross revenue pool and allocating it among the Company's 18 million subscribers, each subscriber's share of that advertising revenue is only $2.54 annually or roughly 22 cents per month, which would only minimally impact the calculation of the rate each subscriber is paying for her Royalty Fee. In other words, if Sirius XM adds 22 cents to each subscription price to calculate the gross revenue, the same 22 cents should be added to the subscription price to calculate the rate being charged for the Royalty Fee. For example, a subscriber with the basic $12.95 plan paying a $1.98 Royalty Fee would actually be paying the same $1.98 Royalty Fee on a total of $13.17 ($12.95 plus $0.22). Including the advertising revenue, the subscriber would be paying a Royalty Fee of 15.03%, compared to the 15.29% rate the subscriber is paying on the $12.95 base rate alone – a negligible difference. And even with the advertising revenue

included, such a subscriber would still be paying far more than the 3% that the Company is entitled to pass through to the subscribers.

86.     Moreover, the impact of any appropriate upward adjustments to include the advertising revenue in the gross revenue would be mitigated, or even completely reversed, by any appropriate downward adjustments to the total revenue (per subscriber) from the amounts subtracted for the various taxes and fees.

87.     In sum, although the calculated rates for the Royalty Fee in Table 1 may not represent the precise percentage of music-related gross revenue that each subscriber is being charged, any discrepancies would not change the fact that Sirius XM is charging substantially more than the 3% it would be charging for a straight-forward pass-through, and that it is taking advantage of its monopoly status by doing so.

> **4.     Sirius    XM    Makes    False    And    Deceptive    Statements To Its Subscribers And The Public About The Music Royalty Fee**

88.     Sirius XM provides in its Customer Agreement and claims to its subscribers and the public that the Royalty Fee is a "pass-through" of costs that is consistent with the FCC Order, which provides that "the combined company may pass through cost *increases* incurred since the filing of the merger application ." FCC Order at 47 (emphasis added).

89.     Sirius XM's billing statements imposing the Royalty Fee direct subscribers to a website, which purports to explain the fee:

> U.S. Music Royalty Fee – Radio subscriptions which include music channels will be charged a fee per paid month of your plan term.  For details see FAQs, xmradio.com/usmusicroyalty.

90.     The Sirius XM Customer Agreement states the following:

U.S. Music Royalty Fee: As of July 29, 2009, new and renewing Subscription Packages which include music channels will be charged a U.S. Music Royalty Fee. For further details on how this fee is calculated see FAQs [hyperlink directing subscriber to Sirius XM website U.S. Music Royalty Fee page].

91.    The billing statements and customer agreements provide almost no information about the Royalty Fee other than directing the subscriber to the Sirius XM website.

92.    The Sirius XM website Royalty Fee page, which is incorporated into the Sirius XM Customer Agreements, provides:

**U.S. Music Royalty Fee**

Effective July 29, 2009, a U.S. Music Royalty Fee has been added to subscriber invoices. Details about the specific costs being passed through to subscribers in this U.S. Music Royalty Fee are provided below.

**1. Why does Sirius XM pay music royalties?**

Music royalty rights were established by Congress and are the product of the Copyright Act. Unlike terrestrial radio, both Sirius and XM are required to pay copyright music royalties to recording artists, musicians and recording companies who hold copyrights in sound recordings (the actual recording of a work). These royalties have risen dramatically as a result of a decision of the Copyright Royalty Board. Like terrestrial radio, Sirius and XM must also pay music publishers who hold copyrights in musical compositions (or the lyrics and music) through their collective organizations, ASCAP, BMI and SESAC. These fees have also risen since March 2007. Finally, Sirius and XM must also pay certain copyright owners to facilitate the recording of content on portable devices.

**2. Who is the Copyright Royalty Board?**

The Copyright Royalty Board consists of three Copyright Royalty Judges who determine rates and terms for statutory copyright licenses that are set forth in the Copyright Act. These administrative judges are appointed by the Librarian of Congress.

**3. Who benefits from the U.S. Music Royalty Fee?**

100% of *the U.S. Music Royalty Fee will be used to offset payments* from Sirius and XM to the music industry.

**4. How is the U.S. Music Royalty Fee calculated?**

We are *passing along the increases* in our costs attributable to statutorily or contractually required payments to the music, recording and publishing industries

26

for the performance of musical works and sound recordings or for device recording fees since March 20, 2007, the date on which we applied to the FCC to approve the merger.

**5. Do all Sirius XM subscribers pay the same fee?**

All subscribers who receive a given package containing music pay the same fee. *We believe charging each Sirius XM subscriber the same fee most equitably apportions the increased fees to subscribers.* Note: some packages, such as News, Sports and Talk contain little music and are not subject to the U.S. Music Royalty Fee.

**6. How much is the U.S. Music Royalty Fee?**

The fee is $1.98 a month on our base $12.95 subscriptions and $.97 for base plans that are eligible for a second radio discount. Your actual fee may vary depending upon the Package and Plan term you choose.

**7. Will I have to pay the U.S. Music Royalty Fee on the free months I received for buying an annual plan?**

No, free months do not incur any U.S. Music Royalty Fees.

**8. When will I pay the U.S. Music Royalty fee?**

For plans renewing after July 28, 2009, the fee will be automatically added to your next bill. There will be no change to your current plan and that plan will remain in effect without change until your next renewal date.

**9. Is the U.S. Music Royalty Fee applied to activations and other fees?**

No.

**10. Do you anticipate further price increases or additional fees in the near future?**

No. We are committed to providing our customers the best value for their entertainment dollar.

**11. Is this fee consistent with Sirius XM's merger commitment not to raise prices for three years?**

Yes. This fee is consistent with our commitment not to raise the base price of specific service plans for three years after the merger. *The FCC decision approving the merger between Sirius and XM permits the companies beginning July 29, 2009 to pass through to subscribers any increases in music royalties since March 20, 2007,* the day the companies first asked the FCC to approve the merger. The U.S. Music Royalty Fee implements this FCC decision.

27

http://www.xmradio.com/about/musicroyalty.xmc; and http://www.sirius.com/usmusicroyalty (emphasis added).

93.    The information provided to the public and Sirius XM's customers and incorporated into its Customer Agreements is false, deceptive and misleading because Sirius XM is not "passing along the increases in [its] costs attributable to statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees since March 20, 2007." Instead, the Royalty Fee charged by Sirius XM is much greater than the actual royalty fee cost increases incurred by Sirius XM since March 20, 2007.

94.    Sirius XM's contractual provisions and statements to its subscribers are false and deceptive because not all subscribers receiving more than incidental music content pay the same fee.

95.    Sirius XM's contractual provisions and statements to its subscribers are false and deceptive because the Royalty Fee does not implement the FCC's Order relating to the pass-through of cost increases.  The Royalty Fee imposed on Sirius XM customers is substantially greater than the "pass-through" of certain "cost increases" set forth in the FCC Order.  *See* FCC Order at 47.

96.    Sirius XM has required its customer service representatives to systematically provide deceptive and erroneous information to subscribers that the Royalty Fee complies with the FCC Order; that Sirius XM has paid and absorbed the royalty fee increases up until July 29, 2009, pursuant to the FCC Order; and that the Royalty Fee is a passing along of the increased royalty fees beginning July 29, 2009 as outlined in the FCC Order.

97.    Sirius XM has required its customer service representatives to provide deceptive and false information to customers by informing them that the amount of the Royalty Fee is due to royalty rate increases mandated by the Copyright Royalty Board. In fact, the royalty increases mandated by the Copyright Royalty Board do not come close to correlating with the increased pricing to Sirius XM customers resulting from the Royalty Fee.

98.    Sirius XM's customer service representatives also have provided information to subscribers that the Royalty Fee is expected to increase by 0.5% each year through 2012; and that under applicable tax regulations, the Royalty Fee is a taxable charge.

## VI.    SIRIUS XM HAS FAILED TO INCREASE CONSUMER CHOICE BY ADDING A LA CARTE PROGRAMMING, AS PROMISED

99.    The FCC Order states that Sirius XM has committed to offer within one year of the merger a $6.99 per month "a la carte" programming option providing 50 channels for both XM and Sirius system users. FCC Order at 11 (*citing* Sirius XM's Joint Opposition to Petitions to Deny and Reply Comments at 11-14 (FCC filing July 24, 2007)). The Company has failed to meet that commitment. As a result, subscribers have yet to see the increased consumer choice that was promised. Additionally, the imposition of the Royalty Fee of $1.98 on top of the $6.99 base rate amounts to more than a 28% price increase – another instance of the newly-constituted monopoly's price-gouging.

100.    Thus far, only Sirius subscribers have any a la carte option. While XM subscribers also should have been offered such plans within one year of the merger, these subscribers are still waiting.

101.    Moreover, the a la carte plan is only available to consumers who purchase one of only two available radio receivers: the Sirius Starmate 5 and the Stratus 6. The manufacturers' suggested retail price ("MSRP") for these two models are substantially higher than the prices for

other satellite radios. Radios that existed at the time of the merger application, at the time of the merger approval, and at the time of the merger's closing, cannot receive a la carte programming and therefore users of such radio cannot take advantage of a la carte pricing. Additionally, automotive manufacturers ("OEMs") do not install either the Starmate 5 or the Stratus 6 into their automobiles.

102.    Thus the overwhelming number of subscribers – XM subscribers, those who still use radios purchased before the merger, those who use radios installed by OEMs, those who chose to purchase less expensive radios than the Starmate 5 or Stratus 6 – have no access to the a la carte discounted pricing.

103.    Additionally, Sirius XM agreed to cap the price of the 50-channel a la carte programming (*i.e.*, the basic a la carte option, compared to the 100-channel "a la carte gold option") at $6.99 per month with no increase for three years after the merger. But for those Sirius subscribers who chose the a la carte option when it was introduced in the fall of 2008, that $6.99 monthly rate was only available until July 2009, before the Company tacked on the $1.98 Royalty Fee, thereby increasing the price of that plan by roughly 28%.

104.    In addition, the la carte programming, in reality, is a tiered bundling of reduced total programming options, which costs more on a channel-by-channel basis than the packages offered before the merger.

## VII.    SIRIUS XM HAS A MONOPOLY IN THE U.S. SDARS MARKET, WHICH IT HAS USED TO THE DETRIMENT OF CONSUMERS

105.    The merger of Sirius and XM into Sirius XM constitutes a willful acquisition and maintenance of monopoly power that was not the result of growth, or development as a consequence of a superior product, business acumen, or historic accident. The merger created a monopoly in the market of SDARS in the United States. The only provider of SDARS in the

United States is the merged entity, Sirius XM. The high barriers to entry prohibit any new competitor from offering consumers lower cost alternatives. Contrary to the DOJ's assumption, Sirius XM has proven that it can profitably impose a significant and non-transitory increase in price that is above the competitive level on consumers in the SDARS market.

106. The anticompetitive effects of the merger and monopoly power vested in the combined entity Sirius XM are, among other things:

a. Eliminating the expected actual, direct, and substantial competition between Sirius and XM;

b. Establishing and maintaining Sirius XM's monopoly of SDARS in the United States;

c. Enabling Sirius XM to exercise monopoly power in the relevant market;

d. Eliminating the competitive constraint that competition between Sirius and XM placed (and would have continued to place) on the price of SDARS in the United States; and

e. Substantially increasing the price of SDARS above competitive levels in the United States.

### A. THE RELEVANT PRODUCT MARKET IS SATELLITE DIGITAL AUDIO RADIO SERVICE IN THE UNITED STATES

107. The relevant product market relating to the antitrust claims is the market for SDARS in the United States.

108. SDARS offers consumers superior programming and benefits over terrestrial radio (*i.e.*, traditional AM/FM radio) or mp3 devices. SDARS is not reasonably interchangeable with radio, mp3 devices, or other products that provide music listening functions.

109. SDARS signals cover millions of square miles, provide consumers with better reception and with less distortion, enable consumers to listen to programming seamlessly without

regard to geographic borders or remoteness, and provides other superior benefits to the consumer, including:

- Commercial free programming with fewer interruptions;
- Superior diversity and variety of programming including programming dedicated to music (of dozens of types for different eras), children, sports, talk and entertainment, religion, education, news, traffic, weather, adult, emergency services, and television simulcasts;
- Programming of public importance and interest (for example, during the 2008 presidential campaign, both Sirius and XM had a channel dedicated solely to the campaign and its issues – POTUS '08);
- Programming that has much less censorship; and
- Programming that is a simulcast of cable television broadcasts, such as CNN and Fox News.

110.    Sirius XM Radio has content relationships with an array of personalities and artists, many of which are exclusive arrangements, including Howard Stern, Martha Stewart, Oprah Winfrey, Jimmy Buffett, Jamie Foxx, Barbara Walters, Opie & Anthony, Bubba the Love Sponge®, The Grateful Dead, Willie Nelson, Bob Dylan, Tom Petty, and Bob Edwards.

111.    Sirius XM is the leader in sports programming as the Official Satellite Radio Partner of the NFL, Major League Baseball®, NASCAR®, NBA, NHL®, and PGA TOUR®, and broadcasts major college sports.

112.    Sirius XM Radio also offers Sirius Backseat TV, the first ever live in-vehicle rear seat entertainment featuring Nickelodeon, Disney Channel and Cartoon Network; XM NavTraffic® service for GPS navigation systems delivers real-time traffic information, including accidents and road construction, for more than 80 North American markets.

113.    As detailed below, contrary to the prediction contained in the DOJ Statement, Sirius XM has been able to profitably sustain a significant and nontransitory increase in price in the SDARS market in the United States, absent price discrimination.

114.    Contrary to the prediction contained in the DOJ Statement, Sirius XM also has been able to profitably impose discriminatory pricing against targeted multi-receiver and OEM subscribers.

115.    The market for SDARS includes high barriers to entry due to the great capital expenditures in the provision of satellites and broadcasting licenses. It took XM over four years from the $90 million purchase of satellite radio spectrum in April 1997, to the time that XM began broadcasting in September 2001. It took Sirius almost five years from the $83 million purchase of the satellite radio spectrum in April 1997, to the time that Sirius began broadcasting in February 2002. Sirius and XM each invested over $5 billion to: (1) develop and upgrade its network and satellites; (2) design chipsets and radios capable of receiving its service; (3) subsidize the cost of such chipsets and radios to encourage their distribution; (4) develop subscriber-based management systems and other information technology; (5) market its brand; and (6) create compelling programming for subscribers.

116.    The FCC Order makes clear that there are significant barriers to entry, including the absence of available spectrum for a potential competitor to acquire:

> As discussed below, assuming a satellite radio product market, *Applicants would have the incentive and ability to raise prices for an extended period of time*. This is more likely given the spectrum and cost barriers which prevent entry by new SDARS providers that could offer consumers an alternative outlet for satellite radio service. In particular, additional spectrum is not available at this time without spectrum divestiture, which we have determined is inappropriate in light of the considerable financial investment needed to successfully operate an SDARS service, as well as the technical complications that might result from such divestiture. Additionally, *the regulatory and other business aspects involved in the start-up of such a cost-intensive operation make effective competitive entry unlikely within any relevant time horizon*.

FCC Order at 5 (emphasis added).

117.    The high barriers to entry make it impossible, at any time in the next four years, for a competitor to enter the market of SDARS in the United States to compete with Sirius XM.

### B.    SIRIUS XM HAS PROFITABLY SUSTAINED THE INCREASED PRICES TO SDARS CONSUMERS

118.    In evaluating a proposed merger, the DOJ and Federal Trade Commission use guidelines for defining the relevant market, and determining whether the proposed merger would threaten competition by giving the merged entity a significant concentration in the relevant market.    In these guidelines, the relevant market is defined as the narrowest group of products that would allow a hypothetical monopolist to profitably impose a "small-but-significant-and-nontransitory-increase-in-price" ("SSNIP"), which is generally a five percent increase.    As detailed below, Sirius XM has imposed significant-and-nontransitory-increases-in-prices over the past year, thus confirming that it is indeed a monopolist.

119.    The Company's second quarter ending June 30, 2009, was the first quarter measuring the effects of the internet access and multi-subscription price increases.    Additionally, Sirius XM announced during this quarter that it would begin charging the Royalty Fee as of July 29, 2009.    Despite these implemented and planned price increases, Sirius XM suffered only a 1% net decline in the number of subscribers, and recorded a 4% increase in revenues.    This performance is particularly impressive in light of the condition of the United States economy during this period.    In contrast, Sirius XM's advertising revenue decreased 33% during this period when compared to the prior year.

120.    The Company's performance was even better during the third quarter, ending September 30, 2009 – the first quarter measuring effects of the 10%-28% price increases imposed by the Royalty Fee.    Sirius XM actually increased subscribers by 0.6% (102,295 subscribers) during this period, and revenues increased by 2% over the previous quarter.

121.    Sirius XM's quarterly report for the period ending September 30, 2009 stated:

The increase in revenue was due mainly to *increased rates* on multi-subscription packages, revenues earned on internet packages, *the introduction of the U.S. Music Royalty Fee* and the sale of "Best of" programming.

Q2 2009 Form 10-Q at 39 (emphasis added).

122.    Sirius XM also has reduced its equipment subsidies, discounts and promotions since the merger resulting in a substantial reduction in its Subscriber Acquisition Cost.  The reduction in subsidies, discounts and promotions effectively increases prices to Sirius XM's subscribers.

123.    Thus despite Sirius XM's various price increases, the Company has enjoyed increased subscribers, increased revenue and increased profitability.  In short, Sirius XM has demonstrated that it can – and will – impose a significant price increase (well over the 5% considered by the DOJ in its merger analysis) and remain profitable.  Accordingly, Sirius XM has also shown that it has monopoly power in the SDARS market, which it is already using to the detriment of its subscribers.

## VIII.  NAMED   PLAINTIFF   SUFFERED   DAMAGES   DUE   TO   THE ANTICOMPETITIVE CONDUCT AND FALSE, DECEPTIVE, AND ILLEGAL ACTS OF SIRIUS XM

124.    Plaintiff Edward A. Scerbo is a New Jersey resident who began paying a quarterly subscription fee for XM SDARS service in December 2008.  Scerbo subscribes to the $12.95 basic monthly ("XM Everything") subscription plan.  Because Scerbo pays quarterly, he pays a total of $38.85, exclusive of taxes and fees, for the basic plan.

125.    Scerbo renews his XM Everything $12.95 plan on a quarterly basis.  On or about September 4, 2009, Scerbo was charged for and began paying a Royalty Fee of $5.94 (or $1.98/month) for his quarterly subscription.

126.    The Royalty Fee was retroactive to June 2009.

127.    Scerbo has suffered damages due to Sirius XM's increased prices and illegal conduct.

## IX.    CLASS ALLEGATIONS

128.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, on behalf of himself and others similarly situated.  The "Class" is defined as follows:

> All persons or entities who reside in the United States and who were parties to an agreement with Sirius Satellite Radio, Inc., XM Satellite Radio Holdings, Inc., Sirius XM Radio Inc. or their affiliated entities for the provision of satellite digital audio radio services during the relevant period of July 28, 2008 through the present.

129.    The following persons shall be excluded from the Class: (1) all persons or entities that make a timely election to be excluded from the proposed Class; (2) governmental entities; and (3) the judge(s) to whom this case is assigned and any immediate family members thereof.

130.    Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

131.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

132.    **Numerosity Under Rule 23(a)(1):**  The members of the Class are so numerous that individual joinder of all the members is impracticable.  Sirius XM reported that, as of September 30, 2009, it had 18,515,730 subscribers.  Upon information and belief, over half of these subscribers already have been improperly and illegally billed for the Royalty Fee, and have paid the Royalty Fee.  Plaintiff believes that approximately 20% of the subscribers are subject to the $2.00 per multi-subscription radio monthly fee implemented in March 2009.  Plaintiff believes that thousands of subscribers have been illegally charged $2.99 for internet access.

133.    **Commonality Under Rule 23(a)(2):** This action involves common questions of law and fact, including, but not limited to, the following:

a.    Whether the merger resulted in a substantially lessening of competition and/or the possession by Sirius XM of monopoly power;

b.    Whether the definition of the relevant market is SDARS in the United States, or some other relevant market;

c.    Whether, through the conduct alleged herein, Defendants willfully acquired, maintained and enhanced monopoly power over SDARS in the United States;

d.    Whether, and to what extent, Defendants' conduct caused Class members to pay supracompetitive prices and, thereby, to suffer antitrust injuries;

e.    Whether Sirius XM's imposition of the Royalty Fee is a pass-through of cost increases incurred since the filing of the March 20, 2007 merger application as a result of statutorily or contractually required payments to the music, recording and publishing industries for the performance of musical works and sound recordings or for device recording fees;

f.    Whether Sirius XM breached its contracts, governed under New York law, with subscribers by charging the Royalty Fee;

g.    Whether Sirius XM made material, false, deceptive and/or misleading statements and disclosures about the identity, type, purpose, and method of calculation of the Royalty Fee; and

h.    Whether Sirius XM's conduct constitutes unfair, illegal, deceptive and/or fraudulent business practices.

134.    **Typicality Under Rule 23(a)(3):** The named Plaintiff's claims are typical of, and not antagonistic to, the claims of the members of the Class. Plaintiff and the members of the

Class he seeks to represent have been deceived and damaged by Sirius XM's unlawful and deceptive conduct.

135.    **Adequacy of Representation under Rule 23(a)(4):** Plaintiff will fairly and adequately protect the interests of the members of the Class, and the representative Plaintiff's interests are coincident with and not antagonistic to those of the other class members he seeks to represent. Plaintiff has retained competent counsel to represent him and the Class.

136.    The Class Can Be Properly Maintained Under Rules 23(b)(1)(A) and (B):

Prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

137.    **The Class Can Be Properly Maintained Under Rule 23(b)(2):** Sirius XM has acted or refused to act, with respect to some or all issues presented in this Complaint, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

138.    **The Class Can Be Properly Maintained Under Rule 23(b)(3):** Questions of law common to the members of the Class predominate over any questions affecting only individual members with respect to some or all issues presented in this Complaint. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Individual litigation of the claims of all class members is impracticable because the cost of litigation would be prohibitively expensive for each class member and would impose an immense burden upon the courts. Plaintiff has no knowledge of pending litigation already begun

by or against class members asserting the same claims that are asserted herein. The conduct of this action as a class action, with respect to some or all of the issues presented in this Complaint, presents fewer management difficulties, conserves the resources of the parties and of the court system, and is the only means to protect the rights of all class members.

**COUNT I**
**(Unlawful Acquisition of Monopoly Power**
**in Violation of Clayton Act § 7)**

139.    Plaintiff incorporates by reference all allegations of all prior paragraphs as though fully set forth herein.

140.    This Count I is brought on behalf of the Class.

141.    The merger of Sirius and XM was a stock acquisition within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

142.    The effect of this acquisition has been to substantially lessen competition and to create or maintain a monopoly in SDARS in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 2 of the Sherman Act, 15 U.S.C. § 2.

143.    SDARS in the United States is the relevant product and geographic market for determination of violations of the Clayton and Sherman Act counts herein. SDARS is not reasonably interchangeable with radio, mp3 devices, or other products that provide music listening functions in the United States.

144.    The high barriers to entry make it impossible, at any time in the next four years, for a competitor to enter the market of SDARS in the United States to compete with Sirius XM.

145.    Sirius XM has and controls 100% market share of the SDARS market in the United States.

146.    As a result of Sirius's, XM's, and Sirius XM's conduct in violation of Section 7 of the Clayton Act, Plaintiff and members of the Class have been injured and have paid artificially inflated prices above competitive levels for SDARS in the United States.

## COUNT II
### (Unlawful Acquisition of Monopoly Power
in Violation of Sherman Act § 2)

147.    Plaintiff incorporates by reference all allegations of all prior paragraphs as though fully set forth herein.

148.    This Count II is brought on behalf of the Class.

149.    Since the July 28, 2008 merger, Sirius XM has had monopoly power in the sale of SDARS in the United States.

150.    Sirius XM willfully obtained and maintained its monopoly power by merging the only two providers of SDARS in the United States.

151.    SDARS in the United States is the relevant product and geographic market for determination of violations of the Clayton and Sherman Act counts herein. SDARS is not reasonably interchangeable with radio, mp3 devices, or other products that provide music listening functions in the United States.

152.    Sirius XM now has and controls 100% market share in the SDARS market in the United States.

153.    The high barriers to entry make it impossible, at any time in the next four years, for a competitor to enter the market of SDARS in the United States to compete with Sirius XM.

154.    As a result of securing their monopoly power as described above, Sirius XM was able to, and did, profitably raise the prices of SDARS by substantial amounts to noncompetitive levels and has maintained those prices at or above those levels since 2008.

155. As a result of Sirius's, XM's, and Sirius XM's illegal conduct, Plaintiff and the Class were injured and paid substantially more than they would have paid in a competitive market for SDARS.

156. During the relevant period, Plaintiff and other Class members purchased substantial amounts of SDARS. As a result of Sirius's, XM's, and Sirius XM's illegal conduct alleged herein, Plaintiff and other Class members paid artificially inflated prices for SDARS.

157. There are no legitimate pro-competitive justifications for the conduct alleged herein, and even if there were, the anticompetitive effects would far outweigh any possible pro-competitive effects.

158. Sirius XM's acts and practices are anticompetitive in nature and tendency and constitute an unfair method of competition, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**COUNT III**
**(Breach of Contract and Breach of Implied**
**Covenant of Good Faith and Fair Dealing)**

159. Plaintiff incorporates by reference all allegations of all prior paragraphs as though fully set forth herein.

160. This Count III is brought on behalf of the Class.

161. Each Class member was a party to a Customer Agreement with Sirius XM or its predecessors under which Sirius XM agreed to provide SDARS. Although the Customer Agreements are form contracts that were revised by Sirius XM from time to time, each of them is substantially in the form of the "Sirius XM Terms and Conditions," attached hereto as Exhibit A.

162. Each and every Customer Agreement is governed by a choice of law provision mandating application of the law of the State of New York.

41

163.    Each Sirius XM Customer Agreement incorporates the FAQs of the Sirius XM websites            http://www.xmradio.com/about/musicroyalty.xmc;            and http://www.sirius.com/usmusicroyalty.

164.    Every contract, including each of the Sirius XM Customer Agreements, imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.

165.    By overbilling the subscribers for the Royalty Fee and providing false and deceptive information about the billing statements, Sirius XM has breached the Sirius XM Customer Agreements.

166.    Plaintiff and the Class have suffered monetary damages in the form of such fees and charges described above.

### COUNT IV
### (Breach of State Consumer Protection Statutes)

167.    Plaintiff incorporates by reference all allegations of all prior paragraphs as though fully set forth herein.

168.    This Count IV is brought on behalf of the Class.

169.    Plaintiff and the Class are "persons" within the meaning of New York GBL §349(h) and all other relevant consumer protection statutes.

170.    GBL §349(a) states: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

171.    As alleged herein, Sirius XM engaged in deceptive acts and practices in the form of misrepresentations and omissions during the conduct of business in and from New York in violation of GBL §349(a) and all other relevant consumer protection statutes.

172.     Sirius XM knew or should have known that its acts, practices, statements, correspondence, invoices and representations, as discussed above, were false and likely to deceive and mislead Plaintiff and the Class.

173.     Plaintiff and the Class have been injured as a result of Sirius XM's violation of GBL § 349(a), and the following other state consumer protection statutes, which also provide a basis for redress to Plaintiff and the Class based on Sirius XM's false, fraudulent, deceptive, unfair and unconscionable acts, practices and conduct:

174.     Sirius XM's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the following jurisdictions:

a.     **Alaska:**  Sirius XM's practices were and are in violation of Alaska's Unfair Trade Practices and Consumer Protection Act, Alaska Stat. § 45.50.471, *et seq.*

b.     **Arizona:**  Sirius XM's practices were and are in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. Ann. § 44-1521, *et seq.*

c.     **Arkansas:**  Sirius XM's practices were and are in violation of Arkansas Code Ann. § 4-88-101, *et seq.*

d.     **California:**     Sirius XM's practices were and are in violation of California's Unfair Competition Law, California Business and Professions Code § 17200, *et seq.*, California's False Advertising Act, Business and Professions Code Section 17500, and the California Consumer Legal Remedies Act, Civil Code Section 1750, *et seq.*

e.     **Colorado:**  Sirius XM's practices were and are in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*

f.     **Connecticut:**  Sirius XM's practices were and are in violation of Connecticut's Gen. Stat. § 42-110a, *et seq.*

g.    **Delaware:** Sirius XM's practices were and are in violation of Delaware's Consumer Fraud Act, Del. Code Ann. tit. 6, § 2511, *et seq.*; and the Deceptive Trade Practices Act, Del. Code Ann. tit. 6, § 2531, *et seq.*

h.    **District of Columbia:** Sirius XM's practices were and are in violation of the District of Columbia's Consumer Protection Act, D.C. Code § 28-3901, *et seq.*

i.    **Florida:** Sirius XM's practices were and are in violation of the Florida Deceptive and Unfair Trade Practices Act, F.S.A. §501.201, *et seq.*

j.    **Georgia:** Sirius XM's practices were and are in violation of the Georgia's Uniform Deceptive Trade Practices Act, Ga. Code Ann. § 10-1-370, *et seq.*

k.    **Hawaii:** Sirius XM's practices were and are in violation of the Hawaii's Uniform Deceptive Trade Practices Act, Haw. Rev. Stat. § 481A-1, *et seq.* and Haw. Rev. Stat. § 480-2.

l.    **Idaho:** Sirius XM's practices were and are in violation of Idaho's Consumer Protection Act, Idaho Code Ann. § 48-601, *et seq.*

m.    **Illinois:** Sirius XM's practices were and are in violation of Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2; and the Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/2.

n.    **Indiana:** Sirius XM's practices were and are in violation of Indiana's Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5-1, *et seq.*

o.    **Kansas:** Sirius XM's practices were and are in violation Kansas's Consumer Protection Act, Kan. Stat. Ann. § 50-623, *et seq.*

p.    **Kentucky:** Sirius XM's practices were and are in violation of Kentucky's Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.*

q.    **Maine:** Sirius XM's practices were and are in violation of Maine's Unfair Trade Practices Act, Me. Rev. Stat. Ann. tit. 5, § 205-A, *et seq.* and Maine's Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. Tit. 10, § 1211, *et seq.*

r.    **Maryland:** Sirius XM's practices were and are in violation of Maryland's Consumer Protection Act, Md. Code Ann. Com. Law § 13-101, *et seq.*

s.    **Massachusetts:** Sirius XM's practices were and are in violation of Massachusetts' Consumer Protection Act, Mass. Gen. Laws ch. 93A, *et seq.*

t.    **Michigan:** Sirius XM's practices were and are in violation of Michigan's Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901, *et seq.*

u.    **Minnesota:** Sirius XM's practices were and are in violation Minnesota's Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.*; and the Unlawful Trade Practices law, Minn. Stat. § 325D.09, *et seq.*

v.    **Missouri:** Sirius XM's practices were and are in violation of Missouri's Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*

w.    **Nebraska:** Sirius XM's practices were and are in violation of Nebraska's Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*; and the Uniform Deceptive Trade Practices Act, § 87-302, *et seq.*

x.    **Nevada:** Sirius XM's practices were and are in violation of Nevada's Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. §§ 598.0903 and. 41.600.

y.    **New Hampshire:** Sirius XM's practices were and are in violation of New Hampshire's Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*

z.  **New Jersey:**  Sirius XM's practices were and are in violation of New Jersey's Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*

aa.  **New Mexico:**  Sirius XM's practices were and are in violation of New Mexico's Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.*

bb.  **North Carolina:**  Sirius XM's practices were and are in violation of North Carolina's Unfair Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1, *et seq.*

cc.  **North Dakota:**  Sirius XM's practices were and are in violation of North Dakota's Unlawful Sales or Advertising Practices law, N.D. Cent. Code § 51-15-01, *et seq.*

dd.  **Ohio:**  Sirius XM's practices were and are in violation of Ohio's Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.01, *et seq.*; and Ohio's Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 4165.01, *et seq.*

ee.  **Oklahoma:**  Sirius XM's practices were and are in violation of Oklahoma's Consumer Protection Act , Okla. Stat. Ann. tit. 15 § 751, *et seq.*, and Oklahoma's Deceptive Trade Practices Act, Okla. Stat. Ann. tit. 78 § 51, *et seq.*

ff.  **Oregon:**  Sirius XM's practices were and are in violation of Oregon's Unlawful Trade Practices law, Or. Rev. Stat. § 646.605, *et seq.*

gg.  **Pennsylvania:**  Sirius XM's practices were and are in violation of Pennsylvania's Unfair Trade Practice and Consumer Protection law, 73 Pa. Stat. Ann. § 201-1, *et seq.*

hh.  **Rhode Island:**  Sirius XM's practices were and are in violation of Rhode Island's Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*

ii.  **South Carolina:**  Sirius XM's practices were and are in violation of South Carolina's Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.*

jj. **South Dakota:** Sirius XM's practices were and are in violation of South Dakota's Deceptive Trade Practices and Consumer Protection Act, S.D. Codified Laws § 37-24-1, *et seq.*

kk. **Texas:** Sirius XM's practices were and are in violation of Texas' Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*

ll. **Utah:** Sirius XM's practices were and are in violation of Utah's Consumer Sales Practices Act, Utah Code Ann. § 13-11-1, *et seq.*, and Utah's Truth in Advertising Law, Utah Code Ann. § 13-11a-1, *et seq.*

mm. **Vermont:** Sirius XM's practices were and are in violation of Vermont's Consumer Fraud Act, Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

nn. **Virginia:** Sirius XM's practices were and are in violation of Virginia's Consumer Protection Act, Va. Code Ann. § 59.1-198, *et seq.*

oo. **Washington:** Sirius XM's practices were and are in violation of Washington's Consumer Protection Act, Wash. Rev. Code 19.86, *et seq.*

pp. **West Virginia:** Sirius XM's practices were and are in violation of West Virginia's Consumer Credit and Protection Act, W. Va. Code § 46A-1-101, *et seq.*

qq. **Wisconsin:** Sirius XM's practices were and are in violation of Wisconsin's Consumer Act, Wis. Stat. §421.101, *et seq.*

rr. **Wyoming:** Sirius XM's practices were and are in violation of Wyoming's Consumer Protection Act, Wyo. Stat. Ann. §40-12-101, *et seq.*

175. Sirius XM violated the aforementioned state unfair and deceptive act and practices laws by charging an excessive fees in violation of their contractual rights and statutory

and common law, and by providing false and deceptive statements and billing statements to Plaintiff and the Class relating to the Royalty Fee.

176.    As a result of Sirius XM's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff and the Class were damaged, will continue to be damaged, and are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs, and other injunctive or declaratory relief as deemed appropriate.

177.    As a result of Sirius XM's violations, Sirius XM has been unjustly enriched to the extent that it has collected excessive fees from Plaintiff and members of the Class. Further, Plaintiff and the members of the Class have suffered monetary damages in the form of such fees and charges described above.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief and judgment as follows:

A.    For an order certifying this action as a class action on behalf of the Class described above;

B.    For restitution and/or disgorgement of all amounts wrongfully charged to and received from Plaintiff and members of the Class;

C.    For damages according to proof;

D.    For an award of treble damages under applicable law;

E.    For an award of punitive damages under applicable law;

F.    For a preliminary or permanent injunction, as the Court may deem proper;

G.    For an award of attorneys' fees as appropriate pursuant to the above cited statutes;

H.    For costs of suit herein incurred;

I.    For both pre- and post-judgment interest on any amounts awarded;

J.    For corrective advertising to ameliorate consumers' mistaken impressions created by Sirius XM's prior advertising and website statements; and

K.    For such other and further relief as the Court may deem proper.

Dated: December 15, 2009

**FARUQI & FARUQI, LLP**

By: _____
Shane T. Rowley (SR-0740)

Nadeem Faruqi (NF-1184)
369 Lexington Avenue
10th Floor
New York, New York 10017
Tel: (212) 983-9330
Fax: (212) 983-9331

**GARDY & NOTIS, LLP**
Mark C. Gardy
James S. Notis
560 Sylvan Avenue
Englewood Cliffs, New Jersey 07632
Tel.:  201-567-7377
Fax:  201-567-7337

*Attorneys for Plaintiff*